| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |
|---|---|

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

JUL 17 1996

Michael N. Milby, Clerk

STUART G. HAYNSWORTH, et al., §
　　　　　　　　　　　　　　　§
　　　　　　　Plaintiffs, §
　　　　　　　　　　　　　　　§
versus　　　　　　　　　　　§　　CIVIL ACTION H-96-210
　　　　　　　　　　　　　　　§
LLOYD'S OF LONDON, et al., §
　　　　　　　　　　　　　　　§
　　　　　　　Defendants. §

## OPINION ON THE FORUM

1.　*Introduction.*

　　Seventy-seven Americans became members of Lloyd's of London to participate in its insurance business. They have sued Lloyd's itself. These members seek to rescind their obligations at Lloyd's arising from policies underwritten by syndicates they had joined. Because they agreed that English law would apply to disputes arising out of their relation to Lloyd's and because they agreed to litigate those disputes in London, this case will be dismissed.

2.　*Lloyd's.*

　　Lloyd's is an exchange--a place where people meet to do business. The business at Lloyd's is underwriting risks through pools of members. Often the risks at Lloyd's cannot be underwritten in conventional markets. The pools are known as syndicates. The syndicates compete for the insurance business among one another. Lloyd's does not share in the profits or losses from the underwriting of risks by the syndicates. Lloyd's itself insures no risk; its duties are regulatory. Lloyd's is managed by a board composed of prominent members who are elected by the members. The board obtains the funds necessary to conduct its business through several institutional arrangements that require member contributions, like the central fund. *See generally* ELIZABETH LUESSENHOP & MARTIN MAYER, RISKY BUSINESS (1995); ADAM RAPHAEL, ULTIMATE RISK: THE INSIDE STORY OF THE LLOYD'S CATASTROPHE (1994); Lloyd's of London Membership Guide, *A Guide to Corporate*

*Membership* (Sept. 1993); Internal Report to the Chairman of Lloyd's, *Report of an Inquiry into Syndicate Participations and the LMX Spiral* (June 1992).

From its inception as a coffee house in 1680, Lloyd's has evolved into a world insurance market. It has operated in a variety of institutional forms over the last 300 years. Since 1871, it has been incorporated by act of Parliament. In the reorganization act of 1982, Parliament relieved Lloyd's itself of much of its potential liability for many aspects of its operation. *See infra* The Lloyd's Act, 1982, § 14(3) (Eng.).

3. *Members.*

The people who belong to Lloyd's fall into two principal groups. Members whose daily tasks require them to be in the trading room are known as working members. Members who do not actively participate in the operations are known as external members. Sometimes they are referred to as "names." Until recently, only natural persons could become members, and no member could limit his liability for his commitments.

In 1990, Lloyd's was comprised of 34,146 total members; 28,770 of those members were actively underwriting. Of those actively underwriting, 18.2% (5,239 members) were working members and 81.8% (23,531 members) were external members. Of the external members, 9.6% (2,259 members) were Americans. Lloyd's of London, *Statistics Relating to Lloyd's* (1994). Since 1990, the membership has declined precipitously to 19,537 in 1993, reflecting the enterprise's losses in profitability. Even more telling, perhaps, is the drastic reduction in the number of syndicates: from 401 in 1990 to 228 in 1993. RAPHAEL, *supra* at 311-12.

A. *Working Members.*

Working members function either as brokers who bring the customers' requests for coverage or as underwriters who set the premiums and accept the risk. The syndicates compete within Lloyd's for underwriting business, each managed by a Managing Agent whose duty to his investors to manage the syndicate with reasonable care. External members, however, deal only with their Members' Agent who acts in the sole interest of that cluster of external members.

These agents earn fees for handling the external members' investments. Because the nature of insurance is the spreading of risks, working and external members join syndicates to pool their risk. A syndicate ordinarily issues a portfolio of underwriting commitments.

Some syndicates specialize in types of risk by casualty, location, or activity. The working member who manages a syndicate earns fees from the investors in that syndicate.

### B. External Members.

An external member or "name" is one who has applied for membership, deposited funds to secure his commitments, and hired a working member as an agent to conduct his business. External members passively furnish capital to other members who are the working underwriters. Brokers have and need no external members. The names decide how much to invest and select in which syndicates to participate. In making these decisions, however, the names rely to a great extent on the advice of their Members' Agents.

### 4. Market Losses.

The words "each for his own part and not for any other" are printed on every Lloyd's insurance policy. A name's liability in a syndicate is several, not joint; no name is ever responsible for the losses of those fellow names who comprise the syndicate. A name is responsible only for his share of a syndicate's losses; however, his liability is unlimited for that share. This is the hallmark of the Lloyd's tradition.

To illustrate: (a) if a working member who is a broker brings a proposal for a tanker to be insured for its value of $10 million against marine casualties, (b) if ten syndicates each accept 10% of the risk, (c) if each syndicate has four equal participants, (d) if the ship is a total loss, and (e) if one member of one syndicate goes broke, then every member of each syndicate pays $250,000, even those who have the broke partner. If one whole syndicate goes broke, the remaining syndicates are obliged only for their specific percentage of the risk they subscribed. The policyholder would then recover only 90% of his loss.

Against the claim for $250,000, the member will have received his share of the premium of about $25,000 less fees and other expenses. The member loses money on that policy, but if the underwriting is done well, his share of other premiums will more than offset the claim on the lost ship.

Members as members are not responsible for the obligations of each other, and the normal practice is that each share stands on its own; of course, formal reinsurance of one syndicate's risks by another is a form of mutual liability.

If the underwriting member accepts risks that he underestimates, resulting in the collection of a premium that is too small, the syndicate will pay more in loss claims than it

collected in premiums, losing money. A pattern of misevaluated risks results in a pattern of losses.

5.  *American Experience.*

After the market as a whole lost money in 1965 and with the rise of corporate insurers, Lloyd's examined its operation. The now-infamous Crowder report suggested several internal reforms to cure complaints of external members who were then British. The report was squelched, and the only recommendation that Lloyd's adopted was to expand its insuring capacity by attracting additional risk capital through new members.

Lloyd's expanded from 2,079 members in 1946, to 7,710 members in 1975. By 1985, it had 26,050 members. Part of this expansion was fueled by the addition of foreigners, including approximately 2,500 Americans. Profits were traditionally generous in the 1970s, but by the mid-1980s, the persistence of several kinds of liability caused current-year losses and the impossibility of reinsurance to close. Between 1990 and 1994, the Lloyd's market lost around £8 billion. Although the British had endured several episodes of losses historically, this was the first time American members were faced with continuous demands for cash to infuse into syndicates. RAPHAEL, *supra* at 3; Lloyd's of London, *Statistics Relating to Lloyd's* (1994).

6.  *Wrongs.*

The American members have identified several ways they were cheated.

A.  *Churning.*

The plaintiffs complain that some managing agents repeatedly reinsured the portfolio of risks held by one syndicate through a new policy with another syndicate. The continual reinsurance, say the plaintiffs, enriched the managing agents through commissions at the expense of the passive members' payment of premiums and commissions. This claim sounds like a description of churning by a stockbroker; in those cases, the broker advises the customer to sell investments and to reinvest the proceeds for the principal purpose of generating commissions on the sales for the broker's benefit rather than achieving the customer's investment objectives.

Assuming that is the claim and assuming that was the practice, the wrong is committed by the managing agent who, of course, owes a fiduciary duty to the member.

- 4 -

Lloyd's itself does not do the acts that constitute the churning. Its fees may well be based on the gross premium earnings, but its indirect benefit from illegal activity does not make it a participant.

B.  *Allocating.*

The plaintiffs complain that some managing agents constructed syndicates of American passive members solely for the purpose of receiving risks from another syndicate. Done objectively, that would simply be reinsurance. The plaintiffs argue, however, that the agents reinsured risks that the agents knew to be long-term and extraordinary. The agents then selectively transferred these known losers from the syndicates they had underwritten to ones that Americans had underwritten. As long as the sucker syndicates are sufficiently solvent to pay the claims, this scheme would work.

An agent who selectively assigns gains and losses after they have occurred or after the likelihood of occurrence has materially increased breaches his duty to his principals. Steering members into syndicates with existing losses or steering reinsurance of existing losses of one's own account to the account of one's principal is wrong. This wrongful allocation, however, can only be done by the agent who manages the member's investment, not Lloyd's.

C.  *Fraud.*

Apart from the individual misdeeds of the agents who were responsible for particular syndicates, the plaintiffs claim to have been injured by a global conspiracy. In essence, this overarching scheme was to attract new money to the market at Lloyd's so that it could be manipulated into covering the losses that were anticipated from existing commitments. The expansion of membership was designed to produce members on whom the issuers of high liability policies could dump their exposure at unreasonably low premiums. Lloyd's was actively procuring the victims, they say, so it was an accessory before the crime.

D.  *Misuse of Common Funds.*

The plaintiffs complain that Lloyd's used common funds to equalize losses among the names contrary to its representations of several but not joint liability.

The Central Fund is administered by Lloyd's through the Council of Lloyd's. Each name is required to make annual contributions to the fund. The plaintiffs argue that money

a name puts into the Central Fund is to be specifically held for the contributing name. Lloyd's could use the name's money only in the event that an individual member's personal assets were insufficient to meet his underwriting commitments.

The plaintiffs argue that in practice, Lloyd's draws money out of the Central Fund indiscriminately, resulting in some names paying for the losses of others. Lloyd's, for example, has agreed to pay the massive losses of several syndicates with the Central Fund. The plaintiffs claim this makes them liable for unknown and unquantifiable asbestos and pollution liabilities of syndicates in whose premiums they did not participate.

The plaintiffs further claim Lloyd's has taken the deposits out of the American Trust Fund and applied them to liabilities of other names. The plaintiffs claim they understood that their deposits into this trust fund were to belong exclusively to the depositing name and that records of the deposits would be individually maintained. The plaintiffs say the trustee of the account, however, maintains the trust account as a commingled fund and does not maintain records of how much of the fund "belongs" to each individual name. As with the Central Fund, the plaintiffs argue Lloyd's has withdrawn money from this trust fund to pay losses without regard to the identity of the contributing name.

7.  *The General Undertaking.*

The plaintiffs mention all of the documents that Lloyd's had them sign, suggesting that the choice of forum and choice of law provisions were hidden from them in a blizzard of paper. The bulk of the paperwork dealt with the member's financial obligations. Beyond the agreement between Lloyd's and the member, the managing agents had their contracts and each syndicate had its separate documentation.

The forum selection and choice of law clauses, however, appear in the critical instrument that forms the relation between a member and the society, as it is called, at Lloyd's. It is a mere one and a half page document called the General Undertaking. The penultimate paragraph of page one chooses the law of England. The ultimate paragraph of page one chooses the courts of England. Lloyd's General Undertaking ¶¶ 2.1., 2.2 (1984). This clause was uniformly adopted by Lloyd's in 1986. Versions of the undertaking before 1982 had similar clauses, but they varied in wording and scope. Lloyd's argues that based on these two clauses in the general undertaking, this case should be dismissed.

- 6 -

8.  *Preclusion.*

Fifty-three of the seventy-seven people who have sued Lloyd's in this case have sued it before; several of the plaintiffs have sued it twice. Both of those cases, one in California and one in New York, resulted in judgments that the choices of law and forum in the membership agreement were to be enforced. The California case is now on appeal. *Roby v. Corporation of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993), *aff'g* 796 F. Supp. 103 (S.D.N.Y. 1992); *Richards v. Lloyd's of London*, 1995 WL 465687 (S.D. Cal. May 1, 1995).

Lloyd's argues that, although those judgments did not reach the cases' substantive claims, the members may not contest again the effect of the choice of law and forum, because that issue was presented fully to the earlier courts. The plaintiffs say that in those cases they did not actually reach the particular claim of invalidity they have in this case. They also say that the judge did not expressly address the validity arguments.

When a judge has issues before her of enforcement and invalidity, her judgment of enforcement necessarily decides the invalidity claim. Fifty-three of the plaintiffs have had an opportunity to oppose the application of the forum selection clause; they may not have actually employed all the grounds that could have been used, but they exhausted their opportunity to question the propriety of enforcing the contract. *Exxon Corp. v. Chick Kam Choo*, 817 F.2d 307, 314 (5th Cir. 1987), *rev'd on other grounds*, 486 U.S. 140 (1988); *Villar v. Crowley Maritime Corp.*, 780 F. Supp. 1467, 1482 (S.D. Tex. 1992).

Lloyd's insists that *all* of the plaintiffs could be said to have had the opportunity to contest the clause since two-thirds of them actually did. Despite the similarity of the claims and the parallel situations of the plaintiffs, each of the remaining twenty-four plaintiffs may litigate the application of the clause.

9.  *Choice of Law & Forum Selection.*

Forum selection clauses are presumptively valid. *International Software Systems, Inc. v. Amplicon, Inc.*, No. 95-50286, slip op. 2040, 2041-42 (5th Cir. Mar. 7, 1996). The presumption of validity may be overcome only by a strong showing that the clause is unreasonable under the circumstances. *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). A forum selection clause is unreasonable only if: (1) its incorporation into the contract was the result of fraud; (2) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; (3) the enforcement of the clauses would contravene a strong public policy of the forum in which the suit is brought, declared by statute or judicial

decision; or (4) the selected forum is so difficult and inconvenient that the complaining party will in effect be deprived of his day in court. *Bonny v. Society of Lloyd's*, 3 F.3d 156, 159-60 (7th Cir. 1993); *Richards*, 1995 WL 465687 at 5; *Roby*, 996 F.2d at 1363.

    A.    *Fraud.*

No plaintiff says that he was tricked into signing the forum selection clause. The assertion is only that the whole contract was procured through deceit. Plaintiffs argue that Lloyd's required the names to sign the forum selection and choice of law clauses to further its continuous fraudulent scheme to insulate itself from actions its fraud in solicitation of capital from the United States.

The plaintiffs must show the court that the forum selection and choice of law clauses themselves were a product of fraud, or they must show that the underlying transaction was a complete sham from which no value was derived by the investor's money. *GATX Leasing Corp. v. DBM Drilling Corp.*, 657 S.W.2d 178, 183 (Tex. App.--San Antonio 1983, no writ); *Leslie v. Lloyd's of London*, 1995 WL 661090 (S.D. Tex. Aug. 20, 1995), *aff'd*, 85 F.3d 625 (5th Cir. 1996). The plaintiffs have done neither. In addition, Lloyd's is not exempt for acts done in bad faith if the plaintiffs choose to sue Lloyd's in England.

    B.    *Plaintiffs' Opportunity to Recover.*

The plaintiffs complain that they have no reasonable opportunity to recover against Lloyd's in England. The principal inhibition to their success in an English lawsuit would be the Lloyd's Act of 1982, where Parliament included a limit of liability for Lloyd's. The act says:

> [T]he Society shall not be liable for damages whether for negligence or other tort, breach of duty or otherwise, in respect of any exercise of or omission to exercise any power, duty or function conferred or imposed by Lloyd's Acts 1871 to 1982 or any byelaw or regulation--
>     (d) in so far as relates to the exercise of, or omission to exercise, disciplinary functions, powers and duties; or
>     (e) in so far as relates to the exercise of, or omission to exercise, any powers, functions or duties under byelaws . . . ; unless the act or omission complained of--
>         (i) was done or omitted to be done in bad faith; or
>         (ii) was that of an employee of the Society and occurred in the course of the employee carrying out . . . duties which do not involve the exercise of any discretion.

The Lloyd's Act, 1982, § 14(3) (Eng.); *see also Bonny*, 3 F.3d at 159-60 (discussing the application of section 14(3) of the 1982 Lloyd's Act to the adequacy of a plaintiff's remedy in a discussion of inconvenient forum).

    The plaintiffs contend that the Lloyd's Act in effect bars them from pursuing their particular causes of action. The Lloyd's Act, however, does not grant immunity in the event of bad faith, and it is not a bar to suit but rather a defense that Lloyd's must affirmatively plead. If the 1982 act completely eliminated the plaintiffs' right to sue in England, which it does not, the critical fact remains that the plaintiffs chose England as a source of law four years after the act was passed. This case arises from moderately long-term business relations voluntarily begun; unlike the plaintiff in a personal injury case who has no part in selecting his tortfeasor, these plaintiffs chose Lloyd's as well as English law, knowing its defects.

    A plaintiff may not circumvent a forum selection clause merely by stating claims under laws not recognized by the forum selected in the agreement. The agreement to submit to the jurisdiction of the English courts must be enforced even if that agreement includes the forfeiture of some claims that could have been brought in a different forum. *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 210 (7th Cir. 1993); *Roby*, 996 F.2d at 1360. Notably, even if the forum selection clause were invalid, because the general undertaking designates English law in its choice of law clause, the parties would still be governed by English law (including the limited liability under the Lloyd's Act of 1982), whether they brought the suit in federal district court in Texas or in the Queens Bench in England.

    To the extent that the 1982 act is retroactive, it is no worse than America's sweeping reorganization of rights and liabilities in its 1989 Financial Institutions Reform, Recovery, and Enforcement Act. Act of August 9, 1989, P. L. 101-73, 103 Stat. 183 (1989) (repealed 1991). Occasional partial legislation does not destroy the general integrity of the American legal order--nor the English one.

    C.    *Texas Law and Public Policy.*

    The Texas consumer protection statute has a provision that invalidates most attempts to waive its protection. TEX. BUS. & COM. CODE § 17.42 ("Any waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void . . . ."). The plaintiffs say that a contract term that chooses the law of England or the courts of England prevents them from having the benefits of Texas consumer protection acts and is void as a waiver.

- 9 -

When a party chooses to go to England to become an underwriter in England, he probably chooses English laws and courts; this choice is not a waiver but a consequence of independent, substantial choices otherwise made.

Choices of law and forum in contracts have the incidental effect of preventing one party from getting to use the laws of all the excluded jurisdictions. Of course, conversely, the parties get the benefits of the selected law. Choices of law through a contract, like arbitration clauses, bind the parties. Whatever policy may be embodied in a consumer protection act, public policy strongly supports private law. Party autonomy allows parties to a contract to specify which laws will govern the contract. Contractually selecting a forum for future litigation is not an impermissible waiver of rights and does not violate public policy, especially when the contracting parties are knowledgeable. *Hoffman v. Burroughs Corp.*, 571 F. Supp. 545, 550 (N.D. Tex. 1982); *Wydel Assoc. v. Thermasol, Ltd.*, 452 F. Supp. 739, 742 (W.D. Tex. 1978); *Accelerated Christian Education, Inc. v. Oracle Corp.*, 1996 WL 98030 (Tex. App.--Dallas, Mar. 7, 1996); *see generally* Christian B. Miller, Note, *M/V Sky Reefer: Clear Sailing for Foreign Arbitration Clauses under COGSA*, 18 HOUS. J. INT'L L. 935 (1996).

D.  *Inconvenient Forum.*

Even if the forum selection clause were void, Lloyd's asserts that the proper forum for this case is England. To decide whether a case has been brought in a forum whose inconvenience vitiates its authority, the court must first determine whether an alternative forum is available for the entire case and all parties can come within its jurisdiction. Second, the court must decide whether that alternative forum is adequate in that the parties will not be deprived of all remedies, even though they may not enjoy the same benefits as in an American court. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254-55 (1981).

If there is an alternative, adequate forum, the court must consider whether the parties' private interests suggest that forum. If the private interests *do not* suggest the alternative forum, the court must consider whether the public interests suggest it. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947); *Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1549 (5th Cir. 1991)

.

(1)     *Available Alternative Forum.*

An alternative forum is available for the plaintiffs in England. Because the parties agreed in their membership contract to settle their disputes in the English courts, the plaintiffs have jurisdiction there. The forum selection clause in the general undertaking vests the plaintiffs with jurisdiction in England. Lloyd's General Undertaking, Section 2.2. Lloyd's cannot, and does not, suggest that the plaintiffs do not have jurisdiction in England. Lloyd's argument against United States' jurisdiction is that the parties must stick to their bargain; that bargain expressly limits the plaintiffs to the right to sue in England. In fact, many of these plaintiffs are presently suing Lloyd's in England as well as in the United States.

(2)     *Adequate Alternative Forum.*

The court must next decide whether the alternative forum is adequate in that the parties will not be deprived of all remedies, even though they may not enjoy the same benefits as in an American court. The plaintiffs argue that the English forum is not adequate because it deprives them of specific claims like the American federal securities laws or Texas consumer acts. They argue that the remedy afforded by the British forum is so clearly unsatisfactory as to be no remedy at all. The possibility of an unfavorable change in the law is merely a factor to be considered, but ordinarily this factor should not be given conclusive or even substantial weight in the forum inquiry. *Piper*, 454 U.S. at 254-55. Even though they would have to rely on a different standard on negligence and it was likely that their potential damages award would be smaller, there is no danger that they will be deprived of all remedies or treated unfairly. Cases where the plaintiff would be *completely* denied a remedy in the foreign jurisdiction should not be dismissed. *See Industrial Development Co. v. Mitsui & Co.*, 671 F.2d 676 (5th Cir. 1982), *vacated and remanded on other grounds*, 460 U.S. 1007 (1983) (involving allegations of U.S. antitrust issues, the court said that "to determine Indonesia to be the proper forum . . . would, in effect, deprive plaintiffs of all remedy," *assuming* that Indonesia would not enforce the foreign antitrust laws). Universally, however, a mere reduction in recovery is not sufficient.

The English courts do not deprive the plaintiffs of all remedies. Even though Lloyd's can raise defenses to the plaintiffs' claims that may not be available here, Lloyd's is not immune from acts it took in bad faith, like fraud, intentional misrepresentation, and conversion. *See Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1145 (5th Cir.

1989) (finding that Bermuda was a more convenient forum than Louisiana for litigating a suit by joint liquidators appointed to conclude affairs of insolvent insurer in Bermuda, even though Bermuda would not recognize liquidators' claim under Racketeer Influenced and Corrupt Organizations Act. Even without the RICO claim, the court found that Bermuda would permit litigation of fraud, negligent misrepresentation, breach of fiduciary duty, and piercing corporate veil parts of liquidators' complaint, sufficiently to qualify it as an adequate alternative forum). The plaintiffs' strict view of remedies would invalidate all forum selection because remedies, by the very nature of differing jurisdictions, will inevitably vary.

>     (3)     *Private Interests.*

Because there is an adequate, available forum, the court must determine whether the private interests suggest that justice lies in another forum. The court must consider the parties' access to sources of proof, compulsory process, and witnesses' cheap attendance, along with other practicalities in the alternative forum that would keep the preparation and trial straightforward, expeditious, and inexpensive. *Gulf Oil*, 330 U.S. at 508; *Baris*, 932 F.2d at 1549.

The defendant is an English entity, and all other potential defendants, working members, members' agents, and managing agents are also in England. The plaintiffs went to England, interviewed Lloyd's representatives there, and hired there managing agents there. The General Undertaking, the fundamental risk-allocation agreement, was signed in England. The insurance policies were issued in England. The overwhelming majority of incidents and the witnesses to these transactions are in England, including the access to sources of proof. These plaintiffs did business for years in England; the location bears a direct relation to the whole business.

The only inconvenience to the plaintiffs is the distance of the forum from the United States. This is not, however, a compelling reason to deny *forum non conveniens* dismissal. In one case, two passengers from Washington State on a cruise line brought a negligence action against the cruise operator in that state. The forum selection clause on the cruise tickets required suit to be brought in Florida. The court allowed dismissal from the Washington court based on *forum non conveniens*, despite the plaintiffs' pleas that a move to Florida would heighten their inconvenience considerably and raise the costs of the litigation. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 588-90 (1991); *see also*

*Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 290 (5th Cir. 1989) (upholding a district court's *forum non conveniens* dismissal where plaintiffs would have to travel to Saudi Arabia to pursue their claim). The defendant's interests must be weighed equally. To hold the case in England would reduce litigation costs, travel costs, and simplify both parties' access to witnesses and sources of proof.

    (4)  *Public Interests.*

  If the private interests *do not* suggest the alternative form, the court must consider whether the public interests suggest it. The private interests emphatically indicate that the forum should be England, and considering the public interest factors only reinforces that choice. Factors the court should evaluate are administrative difficulties including court congestion, the legitimate preference in having regional controversies resolved there, and the alternative court's expertise with the law that will be applied. Furthermore, the court should try to avoid unnecessary conflicts of law and applications of foreign law. *Gulf Oil*, 330 U.S. at 508; *Baris*, 932 F.2d at 1549.

  The litigation of Lloyd's-related cases has been going on for some time in the English courts. Many U.S. courts have already dismissed claims very similar to this one, involving Lloyd's as a defendant, based on *forum non conveniens*. *See, e.g.*, *Bonny*, 3 F.3d at 156, 159-60; *Roby*, 996 F.2d at 1363; *Richards*, 1995 WL 465687 at 5. The English courts have dealt with these claims, will be applying their own law, and have a local interest in deciding the matter locally. That some the names who lost money were Americans is incidental; this controversy involves regional issues, decided best in the English courts. The actions of the attorneys general and the SEC do not represent public interests relevant to an inconvenient forum analysis. The recent attention they have given Lloyd's can be described as politically motivated machinations, at best. Whatever the current and future regulatory public interest in Lloyd's may be, that interest does not attach to a private suit arising out of an historical business relation. Retention of jurisdiction would burden the community, further little or no public interest in the dispute, and apply predominately foreign law. These are grounds enough for dismissing the case on *forum non conveniens*. *See In re Air Crash Disaster near New Orleans*, 821 F.2d 1147, 1165-66 (5th Cir. 1987).

10.  *Equity.*

Somewhere a crippled American will not be compensated for his injuries because an American name refused to pay the claims against the policies he issued.  If, after this unseeming squabble, an American member does not have to pay his share of the losses he underwrote, the American will not beggar his English partners, rather he will beggar American insureds who will not have their claims paid, despite the American member's keeping the premiums.  The plaintiffs have no claim to equity against to the Lloyd's agents and brokers with whom they did business for years.  The plaintiffs are indignant that a consequence of issuing insurance policies is paying claims.

11.  *Regulator's Response.*

The plaintiffs are inordinately proud that several states' attorneys general and the Securities and Exchange Commission have intervened to interfere with Lloyd's collection efforts in America.  All those agencies have been around since the inception of American memberships at Lloyd's, yet only recently have they stirred.  Twenty-five years of silence from the SEC is more than glacial government; it is consent.  This spasm of activity does not represent a public policy to be factored into equity or convenience of the forum.

12.  *Ann Thompson.*

Of the twenty-four plaintiffs who are not precluded, only one apparently did not sign an undertaking after 1986.  The effective undertaking by Ann Thompson, apparently done in 1979, does not contain the choices of law and forum clauses like the later form.  In her version, she consents to appear in any court designated by Lloyd's to respond to claims against her.  She also, however, agrees to arbitrate her disputes in London, and that, from her perspective, may be rather worse.  Incidentally, the old form is four pages to the 1986 form's one and a half pages.

Valid arbitration agreements contained in contracts, like forum selection and choice of law clauses, are enforceable and irrevocable in spite of attacks made on the contract as a whole.  See *Pepe Int'l Development v. Pub Brewing Co.*, 915 S.W.2d 925, 930 (Tex. App.-- Houston [1st Dist.] 1996, no writ).  An arbitration agreement may be vacated if the agreement to arbitrate was itself fraudulently induced.  TEX. CIV. PRAC. & REM. CODE ANN. § 171.014(a)(5); *Hearthshire Braeswood v. Bill Kelly Co.*, 849 S.W.2d 380 (Tex. App.--Houston [14th Dist.] 1993, writ denied); *Gulf Interstate Eng'g v. Pecos Pipeline*, 680

- 14 -

S.W.2d 879 (Tex. App.--Houston [1st Dist.] 1984, writ dism'd). The fraudulent inducement must go the agreement to arbitrate itself and not to the underlying contract. It is not sufficient that fraud induced some part of the contract that is submitted to arbitration. Whether there is a valid agreement to arbitrate is separate from whether all or part of the underlying contract was breached. The former is a question for the trial court, while the latter is for the arbitrator. TEX. CIV. PRAC. & REM. CODE ANN. § 171.014(a)(5); *Shearson Lehman Bros., Inc. v. Kilgore*, 871 S.W.2d 925 (Tex. App.--Corpus Christi 1994, orig. proceeding).

Arbitration is favored by Texas. *Manes v. Dallas Baptist College*, 638 S.W.2d 143, 145 (Tex. App.--Dallas 1982, writ ref'd n.r.e.); *Carpenter v. North River Ins. Co.*, 436 S.W.2d 549, 553 (Tex. Civ. App.--Houston [14th Dist.] 1968, writ ref'd n.r.e.). Under the Texas law, an agreement to arbitrate is valid unless grounds exist for revocation. TEX. REV. CIV. STAT. ANN. art. 224 (1992); *Hearthshire*, 849 S.W.2d at 386.

13.  *Conclusion.*

Because this court finds the forum selection clause in Lloyd's general undertaking agreement to be valid and enforceable, choosing English law and English courts, and because this forum is inconvenient, the case is dismissed.

Signed July \_\_15\_\_, 1996, at Houston, Texas.

                                             Lynn N. Hughes
                                             United States District Judge